190 F.3d 58 (2nd Cir. 1999)
 Bruce McKelvie, Albert Pinette and Jiggy's 91, Inc., Plaintiffs-Appellants,
v.
William Cooper, Fred Hall, William Moryto, Dwayne Tompkins, Philip Colla, Jr., William J. Boucher, M. Rochette, Police Officer, Enfield Police Department, David Diaz, Detective, Connecticut State Police Department, Wayne Rioux, Frank Griffin, Jeff Hotsky, J. Castauguay, Gene Giuliano, Pablo Arroyo, Robert Bardelli, Michael Shanley, James Morin, Darlene Laurin, Timothy Hesney, Matthew Barnwell, Ian Case, Sgt. Berger, Officer Turner and Officer Castle, Defendants-Appellees,
David N. Rosen and Terrance S. Hawkins, Special Masters.
 Docket No. 98-9557
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: June 3, 1999
Decided: August 27, 1999
 
 Plaintiffs appeal from the Magistrate Judge's grant of summary judgment in favor of defendant police officers on plaintiffs' constitutional and state law tort claims arising out of police search of bar and restaurant.
 Affirmed in part, vacated in part, and remanded.
 
 
 1
 John R. Williams, New Haven, CT, for Plaintiffs-Appellants.
 
 
 2
 John P. Pavia, Farmington, CT (David M. Sheridan, Levy & Droney, P.C., of counsel), for Defendants-Appellees Cooper, Hall, Moryto, Tompkins, Rochette, Giuliano, Berger, Turner and Castle.
 
 
 3
 Robert F. Vacchelli, Assistant Attorney General, State of Connecticut, Hartford, CT (Richard Blumenthal, Attorney General, of counsel), for Defendants-Appellees, Colla, Boucher, Diaz, Rioux, Griffin, Hotsky, Castauguay, Arroyo, Bardelli, Shanley, Morin, Laurin, Hesney, Barnwell and Case.
 
 
 4
 Before: OAKES and WALKER, Circuit Judges, and KORMAN,* District Judge.
 
 OAKES, Senior Circuit Judge:
 I. INTRODUCTION
 
 5
 Albert Pinette, Bruce McKelvie, and Jiggy's 91, Inc., plaintiffs, appeal from the Magistrate Judge's grant of summary judgment in favor of defendant police officers on plaintiffs' constitutional and state law tort claims arising out of a police search of a bar and restaurant. Because there were unresolved issues of material fact that should have precluded summary judgment with respect to one plaintiff's claims, we vacate and remand in part. We affirm on all other issues.
 
 II. BACKGROUND
 
 6
 Our recitation of the facts relies on the memorandum opinion of the United States District Court for the District of Connecticut (William I. Garfinkel, Magistrate Judge). While the police officers dispute various aspects of these facts, we view the evidence in the light most favorable to the appellants upon our review of the summary judgment. See Hemphill v. Schott, 141 F.3d 412, 415 (2d Cir. 1998).
 
 
 7
 This case arises out of an October 1995 raid by law enforcement officers on Jiggy's 91, a bar and restaurant located in Enfield, Connecticut.[1] The officers conducted the raid pursuant to a search warrant that authorized a search of the premises for narcotics, weapons, and evidence related to the sale of narcotics. The warrant did not authorize the search of any specific people. In fact, the section of the warrant form on which the issuing judge could have authorized the search of a person was left blank.
 
 
 8
 At approximately 11:40 p.m. on Friday evening, October 27, 1995, police officers entered the bar, some with their weapons drawn and some wearing ski masks to protect their identities. They yelled that they were police officers, shouted "Hit the fucking floor, or we'll shoot," and ordered the nineteen occupants of the bar to lie prone on the floor with their hands crossed behind their heads. Plaintiff Albert Pinette, a patron in the bar, initially thought that the bar was being robbed and remained standing. An officer allegedly shoved Pinette, put a gun to his head, and ordered him to place his hands behind his head and to get down on the floor. Pinette placed his hands behind his head and fell to the floor. He landed near a wall, with one elbow pressed against the wall, one elbow on the floor, and his face pressed into a corner.
 
 
 9
 As Pinette lay on the floor, his shoulder began to ache and he requested permission to shift his position. An officer allegedly threatened that he would "blow [Pinette's] fucking head off" if he moved. When Pinette again requested to move due to the excruciating pain, he felt something "solid" hit him in the back of his head and heard someone tell him to "shut the fuck up." He subsequently learned from an unidentified witness that he had been struck by a gun. Pinette remained on the floor for approximately twenty minutes. During this time, he experienced so much pain due to the position of his shoulder that he almost fainted, but he was ignored when he sought assistance.
 
 
 10
 The record does not clearly describe the chronology of the events that followed. According to the Magistrate Judge, the officers first frisked the bar patrons for weapons and then conducted the search of the premises. As part of that search, an officer walked a police dog trained to detect narcotics around the room. The parties dispute whether the officer directed the dog to sniff the patrons. According to the supervising officer, the patrons were patted down for weapons before the dog was brought in. But the record does not clearly indicate whether the officers patted down Pinette as part of a general frisk of all the patrons or whether they touched him only after he was sniffed by the dog.
 
 
 11
 In any event, while Pinette was lying on the floor, the dog stepped on him three times -- once near the crotch of his pants. To avoid being so stepped on by the dog, Pinette crossed his legs, but an officer allegedly kicked them open again. After the dog sniffed Pinette's crotch, someone probed Pinette's penis, testicles, and anus by poking a finger through his pants.[2] Pinette was then ordered to roll over, but he replied that he could not, due to the position of his arms. The officers allegedly kicked Pinette until he rolled over and then pulled him to his feet. Someone pulled Pinette's shirt out of his pants and again explored Pinette's penis, testicles, and anus through his clothing. By this time, Pinette's pants were undone, although he did not know whether the officers had unbuttoned his pants or whether they came open due to the tugging on his shirt. No weapons or drugs were found on Pinette.
 
 
 12
 While standing, Pinette requested permission to use the restroom. An officer grabbed his shoulder, pushed him, and directed him to the back of the room where other patrons were standing against the wall. Pinette again asked to relieve himself, and the officer refused.[3] Pinette then stood against the wall.
 
 
 13
 About twenty minutes after the officers entered the premises, plaintiff Bruce McKelvie, the bar's owner, arrived through the rear entrance and observed that the pool table had been moved and that the patrons were against the walls on their knees. He did not see any weapons drawn, any dogs, or anyone lying prone on the floor or being searched. He asked "What the hell is going on here? I own the bar." Approximately four of the officers surrounded him, and one told McKelvie that he had killed people for less than what McKelvie had just done. Another officer warned McKelvie, "Don't puff your chest out at me." The officers pushed him from behind, bent his arm behind him, and shoved him at least five times to bring him to the front of the bar. The officer in charge then explained to McKelvie what was going on. McKelvie was neither searched nor ordered to lie on the floor.
 
 
 14
 When the search, which took approximately fifty minutes, was completed, both Pinette and McKelvie were released. Four people were arrested for possession of narcotics. In addition, narcotics were found in various locations on the premises.
 
 
 15
 Pinette, McKelvie, and Jiggy's 91, Inc. sued the officers for (1) conducting an unreasonable search in violation of the Fourth Amendment, (2) intentionally or recklessly inflicting emotional distress under Connecticut law, and (3) seeking to prevent Jiggy's 91, Inc. and McKelvie from conducting a lawful business. Pinette also alleged that the defendants used unreasonable force against him in further violation of the Fourth Amendment.
 
 
 16
 The Magistrate Judge granted the defendants' motion for summary judgment,[4] reasoning that the defendants' conduct was objectively reasonable and that, in the alternative, the defendants were entitled to qualified immunity on the constitutional claims. The court further held that the officers' conduct was not sufficiently extreme or outrageous to support the state law claim.
 
 
 17
 Pinette, McKelvie, and Jiggy's 91, Inc. appeal.
 
 III.
 DISCUSSION
 
 18
 We review the district court's grant of summary judgment de novo. Frank v. Aaronson, 120 F.3d 10, 14 (2d Cir. 1997). To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); Fed. R. Civ. P. 56(c). In deciding such a motion, the district court must view the evidence in the light most favorable to the non moving party and draw all reasonable inferences in its favor. Giano v. Senkowski, 54 F.3d 1050, 1052 (2d Cir. 1995).
 
 
 19
 Hemphill v. Schott, 141 F.3d 412, 415 (2d Cir. 1998).
 
 
 20
 Pinette, McKelvie, and Jiggy's 91, Inc. sought damages under 42 U.S.C. § 1983, which "provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999) (citing 42 U.S.C. § 1983; Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993)). They alleged, among other things, that the officers violated their Fourth Amendment rights by conducting an unreasonable search.
 
 
 21
 The officers were entitled to summary judgment only if the facts, viewed in the light most favorable to the plaintiffs, showed: (1) that the officers' conduct was reasonable as a matter of law, or (2) that the officers were protected under the doctrine of qualified immunity because they had an objectively reasonable basis to assume that their conduct was not contrary to federal law. See Ayeni v. Mottola, 35 F.3d 680, 689 (2d Cir. 1994); Rivera v. United States, 928 F.2d 592, 607 (2d Cir. 1991).
 
 
 22
 Because the plaintiffs did not challenge the initial detention and frisk of the bar patrons upon the officers' entry into the bar, we decline to consider the constitutionality of that initial detention and frisk.[5] Rather, we consider only whether the Magistrate Judge properly granted summary judgment to the officers, based on the record that was before it.
 
 
 23
 In our view, the record was insufficiently developed to permit a conclusion that the officers' conduct relating to Pinette was reasonable as a matter of law. The Magistrate Judge therefore erred by granting summary judgment to the officers on Pinette's claims on that ground.
 
 
 24
 First, the parties disputed facts that were material to a determination of the reasonableness of the over-the-clothing, yet invasive "examination"[6] of Pinette. As noted above, the record does not adequately describe whether Pinette was examined before or after the dog sniffed him. At oral argument, we asked the parties to submit letter briefs addressing whether the complained-of conduct preceded or followed the sniffing by the dog. Only the appellees responded, and their letter brief illustrates the opacity of the record on this point: they submit that the supervising officer testified in an affidavit that the patrons were patted down before the dog began sniffing the room, yet they also note that Pinette's deposition suggests that he was examined after he was sniffed by the dog. The lack of clarity as to how the events unfolded requires reversal of the Magistrate Judge's holding as to Pinette.
 
 
 25
 Moreover, even if the record clarified that the officers handled Pinette only after the dog sniffed him, the record does not indicate whether the dog's behavior justified such an aggressive examination. The Magistrate Judge reasoned that the dog's sniff "alerted" the officers that Pinette may have had drugs, giving rise to "probable cause" to search Pinette. However, the record does not illuminate whether the dog simply sniffed Pinette as a matter of common canine curiosity or, instead, alerted the officers that it smelled drugs on Pinette.
 
 
 26
 The issue of Pinette's continued detention also raised material questions of fact that precluded summary judgment. It appears that the patrons were kept in the bar during the duration of the search, and forced to lie in a prone position on the bar's floor. Any safety related concerns that arguably might have justified an initial detention or frisk, see footnote 5, were satisfied upon completion of the initial frisks. The fact that patrons were kept in the bar suggests that the police were hoping to find drugs on them, despite the fact that the warrant provided only for a search of the premises. Under such circumstances, Pinette's continued detention may also have been unreasonable.
 
 
 27
 Given the unresolved fact issues surrounding the circumstances of the dog sniff, the aggressive examination, and the continued detention, the Magistrate Judge incorrectly concluded that the officers' conduct with respect to Pinette was objectively reasonable. See Rivera, 928 F.2d at 607 (holding that unresolved fact questions regarding physical force used during search precluded summary judgment).
 
 
 28
 Similarly, the Magistrate Judge incorrectly determined that the officers were protected by qualified immunity. That doctrine "shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly established rights of which an objectively reasonable official would have known." Thomas, 165 F.3d at 142 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Where, as here, there are facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate. See id. at 143 (citing Lennon v. Miller, 66 F.3d 416, 420 21 (2d Cir. 1995); Hemphill, 141 F.3d at 416 18); see also Ayeni, 35 F.3d at 689 (holding that existence of unresolved fact issues relating to extent of physical force used and whether measures were justified by purposes of search, and if not, whether conduct was objectively reasonable for purposes of qualified immunity, required reversal of summary judgment).
 
 
 29
 Likewise, the existence of genuine issues of material fact also precluded summary judgment on Pinette's claim for intentional infliction of emotional distress alleged under Connecticut law. To prevail on such a claim under Connecticut law, a plaintiff must establish, among other things, that a defendant's conduct was "extreme and outrageous." See Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337, 1342 (Conn. 1986) (citations omitted). The Magistrate Judge determined that the conduct alleged by Pinette was not sufficiently outrageous to send the issue to the jury,[7] stating that "in the light of the objective reasonableness of [the officers'] conduct, the Court finds that Plaintiffs' claims of intentional infliction of emotional distress must fail." But, as we stated above, the record's lack of clarity should have precluded the finding that the officers' conduct was reasonable. Summary judgment on Pinette's tort claim was therefore in error.
 
 
 30
 For these reasons, we vacate the summary judgment with respect to Pinette's claims for violation of his Fourth Amendment rights and for intentional infliction of emotional distress. We affirm, however, the grant of summary judgment on the claims raised by McKelvie and Jiggy's 91, Inc. McKelvie was not searched and anything done to the bar and restaurant was done pursuant to warrant. In addition, McKelvie has no standing to assert the claims of his customers. See Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990) (noting "well settled principle that a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else").
 
 IV. CONCLUSION
 
 31
 For the foregoing reasons, we vacate the summary judgment with respect to Pinette's Fourth Amendment and state law tort claims, and we remand for further proceedings. We affirm on all other issues.
 
 
 
 Notes:
 
 
 *
 The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.
 
 
 [1]
 Both state and local police officers conducted the search. The Statewide Narcotics Task Force Officers were David Diaz, Wayne Rioux, Frank Griffin, Jeffrey Hotsky, James Castauguay, Pablo Arroyo, Robert Bardelli, Michael Shanley, James Morin, Darlene Laurin, Timothy Hesney, Michael Barnwell, III, and Ian Case. The Enfield Police Officers were Fred Hall, Gary Castle, Barry Berger, Brian Turner, and Mark Rochette. A Special Agent of the Connecticut Department of Consumer Protection, Liquor Control Department, Philip Colla, Jr., followed and conducted a liquor control inspection after police secured the premises. The Magistrate Judge found that Special Agent William Boucher and four Enfield police officers (William Cooper, William Moryto, Dwayne Tompkins, and Gene Giuliano) were not present during the search at issue. The appellants do not argue that the Magistrate Judge's finding as to these five defendants was clearly erroneous.
 
 
 [2]
 According to Pinette,
 I felt someone's hand reach down and grab hold of my penis. Then I felt them playing with my testicles. Then I felt someone's finger insert right into my ass through my pants. That's when I asked "What the hell is going on here?" It was to the point where I was scared for my life, number one. Number two, I didn't know what I had done wrong.
 
 
 [3]
 More precisely, according to Pinette, the officer asked "are you fucking deaf?" and ordered Pinette to "get back against the fucking wall."
 
 
 [4]
 The parties stipulated that the case could be referred to a Magistrate Judge for all purposes, with direct appeal to this Court.
 
 
 [5]
 The constitutionality may have been an issue. See Ybarra v. Illinois, 444 U.S. 85, 92-94 (1979) (holding that although search warrant gave police officers authority to search premises and bartender of small public tavern for narcotics, pat-down search of tavern patron was not constitutionally permissible where there was no reasonable belief that patron was involved in any criminal activity or that the patron was armed or dangerous); United States v. Jaramillo, 25 F.3d 1146, 1152-53 (2d Cir. 1994) (holding that officers, during search of bar conducted pursuant to a valid warrant, could not frisk a patron "who happen[ed] to be in a public place where another person possess[ed] a weapon or contraband," absent reasonable suspicion directed toward that patron). Cf. Rivera v. United States, 928 F.2d 592, 606 (2d Cir. 1991) (noting that police may make limited security searches of people present at apartment being searched pursuant to warrant); United States v. Barlin, 686 F.2d 81, 87 (2d Cir. 1982) (holding that search of handbag of woman who had entered an apartment together with individuals known to be involved in drug transactions constituted a reasonable, self-protective "minimal intrusion").
 
 
 [6]
 The officers describe their treatment of Pinette as a "thorough, but minimally intrusive" pat-down rather than a search. Because in the state of the record before us the officers' treatment of Pinette went beyond the pat-down or frisk contemplated by Terry v. Ohio, 392 U.S. 1, 27 (1968), we decline to refer to it in those terms.
 
 
 [7]
 The question whether a defendant's conduct can be characterized as "extreme or outrageous" has been held to be for determination by the court in the first instance. See Kintner v. Nidec-Torin Corp., 662 F. Supp. 112, 114 (D. Conn. 1987) (citations omitted).